UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| ANGELA FORRESTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 14-CV-0306-CVE-PJC |
| | ) | |
| APEX REMINGTON, INC., d/b/a Apex | ) | |
| Remington Pipe & Supply Co., | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION AND ORDER**

Before the Court is the motion for summary judgment (Dkt. # 16) of defendant Apex Remington, Inc. (Remington). Pursuant to Fed. R. Civ. P. 56, Remington argues that summary judgment is appropriate because plaintiff's claims for gender discrimination under Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000e et seq., and the Oklahoma Anti-Discrimination Act (OADA), OKLA. STAT. tit. 25, § 1301 et seq., are not supported by evidence and because plaintiff cannot prove all essential elements of her claim for intentional infliction of emotional distress. Dkt. # 16. Plaintiff responds that genuine disputes as to material facts exist to preclude summary judgment on her gender discrimination claims, but she agrees that summary judgment is appropriate on her intentional infliction of emotional distress claim. Dkt. # 24. Remington has filed a reply. Dkt. # 30. The Court grants summary judgment in favor of Remington on plaintiff's intentional infliction of emotional distress claim.

**I.**

In 2008, Colby Forrester (Forrester), who is plaintiff's husband, and Calvin Cannon founded Remington, which supplies products used in oil fields. Dkt. # 16-1, at 2. The enterprise grew quickly, and later that year plaintiff began working at Remington. Dkt. # 16-2, at 4. Prior to working

at Remington, plaintiff had been a stay-at-home mother, a clerical worker at a law firm, a correctional officer, an optometry assistant, and a retail employee. Id. at 4-7. She had a GED and had taken some college classes, but she did not earn a degree. Id. at 3. Initially, plaintiff served as Remington's receptionist, but she gradually took on greater responsibilities, including office manager, corporate secretary, and finally director of the human resources and accounting departments. Dkt. # 16-1, at 7-8, 11. While at Remington, plaintiff attended several seminars on topics related to human resources. Dkt. # 16-2, at 3.

In October 2009, Apex Distribution purchased Remington, but it left the management structure unchanged. Dkt. # 16-1, at 5. Remington continued to grow, opening more than fifty stores and warehouses in numerous states and employing more than eighty people. Id. at 11, 26. Forrester determined the pay and bonuses due to most Remington employees, including plaintiff, Cannon, and himself. Id. at 15. Although plaintiff was initially unpaid, she quickly became a salaried employee; in 2011, plaintiff received a $66,980 salary, and her salary increased to $90,884.54 in 2012. Id. at 15-16, 19. During this time, some Remington employees, whom plaintiff identifies as predominantly but not exclusively male, began to perceive plaintiff as having extra privileges as a result of her relationship with Forrester.[1] Dkt. # 16-2, at 13-14. Cannon, having heard similar complaints from employees, spoke with Forrester about the perception of favoritism concerning plaintiff. Dkt. # 16-3, at 2-3.

In August 2012, Russel Metals, Inc. (Russel) announced that it intended to purchase Apex Distribution and, by extension, Remington. Dkt. # 16-1, at 25. As part of the acquisition, Russel

---

[1] Plaintiff states that she did not in fact have any extra privileges, but she agrees that she was perceived as having such privileges by other Remington employees. Dkt. # 16-2, at 14.

president Brian Hedges sent subordinates to Remington's Tulsa office to determine what, if any, changes would need to be made. Dkt. # 16-4, at 16. The subordinates reported complaints from employees, leading Hedges to characterize the office as "a command and control culture led by both [plaintiff] and [Forrester]" and a "culture . . . [that] wasn't a healthy culture." Id. at 10, 16. Hedges arranged to meet with Forrester and the president of Apex Distribution in October 2012 to discuss the terms of the acquisition. Id. at 5. At that meeting, Hedges told Forrester that plaintiff must be terminated. Id. at 6. He specifically cited the "concentration of power" between plaintiff and Forrester as a problem, noting that plaintiff ran several departments and answered only to Forrester. Id.; see also Dkt. # 16-1, at 29. In his deposition, Hedges identified other bases for his decision that he did not disclose in the meeting, including plaintiff's lack of formal education or experience in either human resources or accounting as well as her presence contributing to the Tulsa office's unhealthy culture. Dkt. # 16-4, at 6, 16. However, he stated that "[i]f the positions had been reversed . . . we would have been requiring [Forrester] to leave the company, and [plaintiff] would have been asked to continue with the company." Id. at 18. In November 2012, Russel acquired Apex Distribution and Remington. Dkt. # 16-1, at 25.

Plaintiff never spoke to Hedges. Dkt. # 16-2, at 9. She learned that she would be terminated through conversations with Forrester, who told her that Hedges "didn't like the fact that [she] had the same last name as [Forrester]." Id. at 10. Plaintiff continued working at Remington for several months after the purchase.[2] Dkt. # 16-2, at 15. Plaintiff was directly involved in the hiring of Lucy Cravens to be her replacement as the director of human resources. Dkt. # 24-4, at 9-10. Following

---

[2]  The petition states that plaintiff's employment was terminated on December 12, 2012. Dkt. # 2-3, at 2. However, in her deposition, plaintiff admits to working for some time beyond that date. Dkt. # 16-2, at 15. Exactly when plaintiff ceased to work at Remington is unclear.

3

her termination, plaintiff applied for sales positions at area retail stores, but she has not sought any human resources or corporate positions. Dkt. # 16-2, at 8.

At the time of plaintiff's termination, Russel had an anti-nepotism policy in place.[3] Dkt. # 24-5. The policy states that "[a]n employee's family member may not be placed under the direct supervision of another family member or be appraised, evaluated or have their [sic] remuneration determined or processed by a family member." Id. To Hedges's knowledge, no executive at one of Russel's companies, other than plaintiff, has been affected by the policy. Dkt. # 16-4, at 12-13. At least five other familial groups, one of which includes Cravens, exist that could be affected by the policy, Dkt. # 24-7, but thus far no one within those groups, male or female, has been terminated for violating the anti-nepotism policy.

Subsequent to her termination, plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission, which issued her a notice of right to sue. Dkt. # 2-3, at 1-2. On May 20, 2014, Plaintiff filed her petition in the district court for Tulsa County, Oklahoma. Id. at 1. Remington timely removed to this Court, Dkt. # 2, and it now moves for summary judgment. Dkt. # 16.

## II.

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S.

---

[3] Remington argues that the application of Russel's anti-nepotism policy is irrelevant because plaintiff was terminated prior to the Russel's purchase of Remington. Dkt. # 30, at 7. Although the decision to terminate plaintiff was made prior to the purchase, see Dkt. # 16-4, at 5, plaintiff was not actually terminated until at least one month after the purchase was complete. Dkt. # 16-2, at 15.

242, 250 (1986); Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993). The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex, 477 U.S. at 317. "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" Id. at 327.

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." Anderson, 477 U.S. at 252. In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 250. In its review, the Court construes the record in the light most favorable to the party opposing summary judgment. Garratt v. Walker, 164 F.3d 1249, 1251 (10th Cir. 1998).

## III.

Plaintiff alleges that Remington terminated her employment because she is female. Dkt. # 24, at 5. Title VII states that it is "an unlawful employment practice for an employer . . . to discharge any individual . . . because of such individual's . . . sex . . . ." 42 U.S.C. § 2000e-2(a). A plaintiff

5

may prove gender discrimination through either direct or circumstantial evidence. See Furr v. AT&T Techs., Inc., 824 F.2d 1537, 1549 (10th Cir. 1987). As plaintiff presents no direct evidence of discrimination, see Dkt. # 24, at 18, the Court evaluates plaintiff's Title VII claim according to the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03 (1973).

> Under the *McDonnell Douglas* framework, the plaintiff "must carry the initial burden under the statute of establishing a prima facie case of . . . discrimination." Once the plaintiff has established a prima facie case, "[t]he burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason" for its employment action. If the defendant makes this showing, the plaintiff must then show that the defendant's justification is pretextual.

Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220, 1226 (10th Cir. 2000) (citations omitted). Remington argues that summary judgment is appropriate because plaintiff cannot either establish a prima facie case or show pretext. Dkt. # 16, at 19-26. Plaintiff contends that she has satisfied her burden of establishing a prima facie case and that she has presented sufficient evidence of pretext to preclude summary judgment. Dkt. # 24, at 18-26.

A. Prima Facie Case

"[A] plaintiff must first establish a prima facie case of discrimination by showing (1) membership in a protected class and (2) an adverse employment action (3) that took place under circumstances giving rise to an inference of discrimination." Daniels v. UPS, Inc., 701 F.3d 620, 627 (10th Cir. 2012) (citing EEOC v. PVNF, L.L.C., 487 F.3d 790, 800 (10th Cir. 2007)); see also Adamson v. Multi Cmty. Diversified Servs., Inc., 514 F.3d 1136, 1150 (10th Cir. 2008) ("Generally stated, a prima facie case of discriminatory discharge under Title VII requires plaintiff to demonstrate that she (1) belongs to a protected class; (2) was qualified for her position; (3) was discharged; and (4) her position was not eliminated after her discharge." (citing Kendrick, 220 F.3d at 1229)). "The critical prima facie inquiry in all cases is whether the plaintiff has demonstrated that

6

the adverse employment action occurred 'under circumstances which give rise to an inference of unlawful discrimination.'" Kendrick, 220 F.3d at 1227 (quoting Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981)). "As the very name 'prima facie case' suggests, there must be at least a logical connection between each element of the prima facie case and the illegal discrimination for which it establishes a 'legally mandatory, rebuttable presumption.'" O'Connor v. Consol. Coin Caterers Corp., 517 U.S. 308, 312 (1996) (quoting Burdine, 450 U.S. at 254 n.7). Plaintiff's burden at this stage is de minimis. Plotke v. White, 405 F.3d 1092, 1101 (10th Cir. 2005).

Remington argues that Adamson controls and that, under Adamson, plaintiff has not raised even an inference of discrimination. Dkt. # 16, at 19. In that case, Mr. Adamson, who had served as the defendant's chief executive officer for several years, hired his wife and daughter as the business manager and sales representative, respectively, for one of the defendant's retail subsidiaries. Adamson, 514 F.3d at 1140-41. All three were terminated simultaneously, with the stated reasons being Mr. Adamson's "unilateral management style," his transfers of money between the defendant and its subsidiary, and the defendant's corporate anti-nepotism policy. Id. at 1142. The plaintiffs brought suit under Title VII, with Mr. Adamson arguing age discrimination and reverse gender discrimination and Mrs. and Ms. Adamson arguing gender discrimination. Id. at 1143. The district court, presuming the existence of a prima facie case based on the familial relationship of the parties, proceeded directly to the pretext inquiry and concluded that plaintiffs failed to demonstrate pretext. Id. While the Tenth Circuit upheld the district court's ultimate conclusion regarding pretext, it found that Mrs. and Ms. Adamson had failed to establish a prima facie case of discrimination. Id. at 1149. The circuit court stated that "[f]amilial status is not a classification based on sex any more than is being a sibling or relative generally. It is, by definition, gender neutral." Id. at 1148 (internal

7

punctuation marks omitted). Thus, termination based on familial status "fall[s] outside the scope of Title VII and its purpose in protecting employees against invidious discrimination on the basis of sex." Id. at 1149. The Tenth Circuit then reviewed the record and found that the only other evidence presented--a single gender-neutral remark and the inconsistent application of the anti-nepotism policy against the plaintiffs alone--did not support an inference of discrimination. Id. at 1152-53.

The record certainly supports Remington's contention that plaintiff was terminated in part because of her familial status and the effect of her relationship on Remington's power structure. Plaintiff testified that, after the meeting with Hedges, Forrester informed her that she "was being terminated because they didn't like the fact that I had the same last name as him." Dkt. # 16-2, at 10. Forrester also told plaintiff that Hedges decided to fire her because he "felt there was too great a concentration of power." Id. at 11. When asked whether there was any other reason for her termination, plaintiff said "I don't know." Id. at 23. Forrester was asked whether plaintiff's gender was a cause for her termination, and he answered: "No. . . . [Hedges] said we can't have this much control . . . in an operation, and her especially reporting to you." Dkt. # 16-1, at 29. In his deposition, Hedges identified plaintiff's marital status as one of the many reasons he wanted her terminated. Dkt. # 16-4, at 6. And in the petition's recitation of facts, it alleges that "Defendant then terminated Plaintiff's employment on December 12, 2012 informing her that she was being fired because she was married to the company's president . . . which allegedly violated the Defendant's anti-nepotism policy." Dkt. # 2-3, at 2.

Plaintiff argues that other evidence in the record, separate from her marriage, is sufficient to give rise to an inference of discrimination, "including inherently gender biased assessments of her leadership style and personality, disparate application of the Defendant's nepotism policy, and

8

gender-based assessments of her job qualifications." Dkt. # 24, at 18. During his testimony, Hedges described one of the other reasons, beyond plaintiff's marriage, that he chose to terminate her: "They were performance issues and other personal relationships in the company that were not seen as being positive, that the culture there seemed to be a command and control culture led by both [plaintiff] and [Forrester]." Dkt. # 16-4, at 10. Plaintiff argues that the use of the phrase "command and control" to characterize her leadership style is "inherently gender biased, and clearly infer[s] a discriminatory reason for the Plaintiff's termination." Dkt. # 24, at 10; see also id. at 19-20. However, the Court finds no gender bias in the phrase. In Adamson, the defendant fired the plaintiffs in part because they felt Mr. Adamson might "exert undue influence" over his wife and daughter, and the plaintiffs argued that the defendant's use of that phrase was biased and suggested a discriminatory motive. Adamson, 514 F.3d at 1151. The Tenth Circuit "note[d] the remark is gender-neutral on its face and will not, without more, support an inference of discriminatory intent. . . . [A]n employee's subjective belief in a comment's invidious nature . . . does not support an inference of discriminatory intent." Id. (citations omitted). Like the phrase in Adamson, Hedges's use of "command and control" to describe plaintiff's leadership style is facially gender-neutral-- indeed, Hedges used the phrase to describe both plaintiff and Forrester--and plaintiff has presented no evidence that it carries any gender-biased implication. Thus, it does not create an inference of discriminatory intent.

Plaintiff also argues that the disparate application of Russel's anti-nepotism policy gives rise to an inference of gender discrimination. In Adamson, the Tenth Circuit opined: "[E]vidence that a gender neutral anti-nepotism policy is applied in a manner that disproportionately impacts women may give rise to an inference of sex-based discrimination without proof of discriminatory intent."

9

Id. at 1152 (citing Thomas v. Metroflight, Inc., 814 F.2d 1506, 109-10 (10th Cir. 1987)). However, the court described a plaintiff's burden of proof under such a theory as "onerous," stating that "a plaintiff must show that the 'facially neutral standards in question selects applicants . . . in a significantly discriminatory pattern.'" Id. (quoting Thomas, 814 F.2s at 1509). The plaintiffs in Adamson argued that application of the policy to them, but not to either a father and son or mother and daughter also employed by the defendant, was evidence of gender-based discrimination. Id. The Tenth Circuit disagreed, finding that the plaintiffs' argument "falls far short of establishing any 'significant' or statistically supported inference of discrimination." Id. Here, plaintiff has identified five other family groups among Remington's employees to which the anti-nepotism policy could have been but was not applied: two sisters in Tulsa;[4] a father, mother, and two sons in North Dakota; a father and son in Pennsylvania; a father and two sons in Texas; and a husband and wife in Texas. Dkt. # 24-7. As in Adamson, plaintiff has provided no evidence that the anti-nepotism policy has been applied in a manner that is "significantly discriminatory." Id. The application of the anti-nepotism policy does not support an inference of discrimination.

Finally, plaintiff argues that she has met her burden of establishing a prima facie case because she has presented evidence that Remington engaged in "gender-based assessments of her job qualifications." Dkt. # 24, at 18. Plaintiff's confusing argument appears to be rooted in the belief that, had plaintiff been male, she would have been offered another position within the company or been given a different supervisor, as opposed to being terminated. See id. at 19, 21. When asked, Hedges stated that he "had no intention" of moving plaintiff to another position, citing "the

---

[4] One of these sisters is Lucy Cravens, who now serves as Remington's director of human resources, the position plaintiff formerly held. Dkt. # 24-7.

performance issues that had been identified and her overbearing mannerisms that were reported to us. We just didn't think she'd be healthy in the culture we wanted to create in the company." Dkt. # 24-3, at 3. Hedges later said that "[i]f the positions had been reversed, yes, we would have been requiring [Forrester] to leave the company, and [plaintiff] would have been asked to continue with the company." Dkt. # 16-4, at 18. Plaintiff argues that Hedges's statements show an "inherent" gender bias, Dkt. # 24, at 19, but she presents no evidence to support her assertion. The Court sees no gender bias in the description of plaintiff as having "overbearing mannerisms" or as being part of an unhealthy corporate culture. Moreover, Hedges's testimony that he would have terminated Forrester if the roles had been reversed cuts against plaintiff's conclusion. Absent additional evidence, the description of plaintiff's abilities and plaintiff's belief that Remington would have acted differently toward a male do not raise an inference of discrimination. See Adamson, 514 F.3d at 1152 ("Without more, moreover, an employee's subjective belief in a comment's invidious nature also does not support an inference of discriminatory intent." (citations omitted)).

To establish a prima facie case for unlawful termination, a plaintiff must show that the termination "took place under circumstances giving rise to an inference of discrimination." Daniels, 701 F.3d at 627. Plaintiff has failed to show such circumstances, as her proffered arguments are either unprotected under Title VII or show no signs of gender bias. As plaintiff cannot satisfy her initial burden under the McDonnell Douglas framework, her Title VII claim must fail.

B. Pretext

However, even if plaintiff had met her initial burden under McDonnell Douglas, summary judgment would remain appropriate because she has in no way demonstrated that Remington's

stated reasons for terminating her were pretextual.[5] See Kendrick, 220 F.3d at 1226. "A plaintiff can show pretext by revealing 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence . . . .'" Plotke, 405 F.3d at 1102 (quoting Morgan v. Hilti, Inc., 108 F.3d 1319, 1323 (10th Cir. 1997)).

> A plaintiff typically makes a showing of pretext in one of three ways: (1) with evidence that the defendant's stated reason for the adverse employment action was false; (2) with evidence that the defendant acted contrary to a written company policy prescribing the action to be taken by the defendant under the circumstances, or (3) with evidence that the defendant acted contrary to an unwritten policy or contrary to company practice when making the adverse employment decision affecting the plaintiff.

Kendrick, 220 F.3d at 1230 (citations omitted). Evidence of pretext is not limited to these three methods but "may also take a variety of other forms." Swackhammer v. Sprint/United Mgmt. Co., 493 F.3d 1160, 1168 (10th Cir. 2007). The Court must "examine the facts as they appear[ed] *to the person making the decision*." E.E.O.C. v. C.R. England, Inc., 644 F.3d 1028, 1044 (10th Cir. 2011) (emphasis in original) (quoting Zamora v. Elite Logistics, Inc., 478 F.3d 1160, 1166 (10th Cir. 2007)).

Plaintiff first argues that she has presented evidence that Remington's stated reason for terminating her was false. Dkt. # 24, at 25. In Cole v. Ruidoso Municipal Schools, 43 F.3d 1373,

---

[5]  Plaintiff does not contest that Remington satisfied its burden to present a legitimate, nondiscriminatory reason for terminating her employment. See Dkt. # 24, at 23. Remington asserts that it fired plaintiff "because of her familial relationship to the President of the company, the improper concentration of power between the two of them, Plaintiff's disruptive presence in the workforce, and her lack of qualifications for the jobs assigned to her by her husband." Dkt. # 16, at 23. In his deposition, Hedges cited each of these issues as part of the calculus that led to plaintiff's termination. Dkt. # 16-4, at 6-7, 10. The Court finds that Remington has met its burden of providing a nondiscriminatory reason for terminating plaintiff.

12

1378 (10th Cir. 1994), the defendant school district chose not to renew the plaintiff's appointment as middle school principal for the stated reasons that the plaintiff had been unable to resolve faculty conflicts, which in turn had begun affecting the quality of education. However, the evidence told a different story: previous male administrators had been unable to quell the faculty conflicts; the plaintiff had received glowing performance reviews even while the conflicts continued; and students' test scores increased dramatically during the plaintiff's tenure, despite the issues with the school's faculty. Id. at 1380-81. The Tenth Circuit found that this evidence raised "substantial questions of fact whether disbelief of the proffered reason for [the plaintiff's] nonrenewal may, together with the elements of [the plaintiff's] prima facie case, show intentional discrimination." Id. at 1381. Accordingly, the Tenth Circuit remanded the case to the district court for further proceedings on the plaintiff's gender discrimination claim. Id. at 1387.

Bearing in mind that the facts must be examined from the point of view of Hedges, the decision-maker, the Court finds that plaintiff has presented no contradiction between the evidence here and Remington's stated reasons for terminating plaintiff. Remington asserts the following reasons for termination: plaintiff's marriage to Forrester, and the ensuing concentration of executive authority; plaintiff being a "disruptive presence" within the company; and plaintiff's lack of formal qualifications for her positions. Dkt. # 16, at 23. It is undisputed that plaintiff and Forrester were married and that, as president and director of human resources, they were two of Remington's executives. Dkt. # 24, at 5. Both Forrester and Hedges testified that, at the meeting between Hedges and Forrester, Hedges told Forrester that the reason for plaintiff's termination was the amount of control over Remington that the two held. Dkt. # 16-1, at 28-29; Dkt. # 16-4, at 6-7. Hedges also testified that he had received reports from his subordinates that plaintiff was one of the sources of

what he considered an unhealthy corporate culture at Remington's Tulsa office. Dkt. # 16-4, at 10, 14, 16. Hedges specifically identified plaintiff's lack of formal education and prior experience as being among his reasons for wanting plaintiff removed from her position. Dkt. # 16-4, at 6. It is uncontested that plaintiff's education was limited to a GED, a few college courses, and some seminars on topics in the human resources field. Dkt. # 16-2, at 5-6. It is also uncontested that plaintiff had no prior experience in human resources or accounting prior to working at Remington. Id. at 4-7. Thus, unlike in Cole, the evidence in the record conforms to Remington's stated reasons for termination.

Plaintiff argues that Hedges did not "uncover[] complaints regarding the Plaintiff's actual job performance" and "considered the Plaintiff to be under-qualified for the job she had successfully executed for over three years because she had previously chosen to be a stay-at-home mother." Dkt. # 24, at 24. However, these arguments do not show that Remington's stated reasons for terminating plaintiff were false. First, plaintiff points to no requirement, and the Court can find none, that would require the decision-maker to have personally investigated the basis for terminating an employee, rather than allowing the decision-maker to rely on the opinions of unbiased subordinates.[6] Cf. E.E.O.C. v. BCI Coca-Cola Bottling Co. of L.A., 450 F.3d 476, 484 (10th Cir. 2006) (describing the "cat's paw" theory of Title VII liability, where a biased subordinate deceives a decision-maker into committing a discriminatory action). Second, Hedges specifically stated that he found plaintiff

---

[6] Plaintiff characterizes the subordinates' opinions as being based on "inherently gender-biased water-cooler gossip and rumors." Dkt. # 24, at 24. However, plaintiff provides no substantiation to her assertion the "gossip and rumors" on which the subordinates allegedly relied were biased. Merely stating that the basis for the opinions was biased is not sufficient to preclude summary judgment. FED. R. CIV. P. 56(c)(1) (requiring factual assertions to be supported by evidence in the record).

lacking in formal education and prior experience, not that she was under-qualified because she had been a stay-at-home mother. Although plaintiff argues that she has presented evidence showing that Remington's stated reasons for termination were false, the evidence is consistent with, rather than contradicts, Remington's stated reasons, and as such plaintiff's argument does not show pretext.

Plaintiff also argues that she has made a showing of pretext sufficient to preclude summary judgment by presenting evidence that Remington applied the anti-nepotism policy inconsistently. Dkt. # 24, at 24. The policy states that "[a]n employee's family member may not be placed under the direct supervision of another family member or be appraised, evaluated or have their remuneration determined . . . by a family member." Dkt. # 24-5. Evidence that a defendant acted contrary to an existing policy is one of the ways in which a plaintiff may show that a defendant's stated reasons for termination were a pretext for unlawful discrimination. Kendrick, 220 F.3d at 1230. It is uncontested that Forrester was plaintiff's supervisor and that he determined her yearly salary and bonuses. See Dkt. # 16-1, at 15-17; Dkt. # 16-2, at 16. Plaintiff points to "three other sets of employees who were related and reporting to one another" yet who were unaffected by the policy. Dkt. # 24, at 25. However, the sets of employees that plaintiff identified consist of two sisters, an aunt and niece, and a father and son. See Dkt. # 24-2, at 17; Dkt. # 24-7. Such evidence does not show that Remington has applied the policy in a manner that discriminates against women; rather, it shows that Remington applied the policy to plaintiff alone, not to women generally. Application of the policy is not sufficient to show that Remington's stated reasons for terminating plaintiff were pretextual.

Under the McDonnell Douglas framework, the burden rests with the plaintiff to show that the defendant's otherwise-legitimate justifications for termination were pretexts for unlawful

discrimination. Plaintiff has failed to show that Remington's stated reasons for termination were false because the evidence conforms to the stated explanations, and plaintiff's argument that Remington applied a policy inconsistently is unavailing because nothing about the application of the policy reveals discrimination on the basis of gender. Plaintiff has not carried her burden to demonstrate that Remington's stated justifications were pretextual. Because plaintiff can neither establish a prima facie case nor show pretext, summary judgment is warranted. The Court grants summary judgment in favor of Remington as to plaintiff's claim for gender discrimination under Title VII.

## IV.

Plaintiff's petition also sets forth a claim of gender discrimination under the OADA.[7] Dkt. # 2-3, at 4. Like Title VII, the OADA makes it "a discriminatory practice for an employer . . . to discharge . . . an individual . . . because of . . . sex . . . ." OKLA. STAT. tit. 25, § 1302(A). "The Tenth Circuit has determined that a plaintiff's OADA claim fails if his federal discrimination claims fail." Broyles v. Howard-DCIII, LLC, No. 13-CV-0102-CVE-TLW, 2014 WL 347043, at *13 (N.D. Okla. Jan. 30, 2014) (collecting cases); see also McCully v. Am. Airlines, Inc., 695 F. Supp. 2d 1225, 1246-47 (N.D. Okla. 2010) (same). Because plaintiff's claim under Title VII fails, plaintiff's claim under the OADA must also fail. The Court grants summary judgment in favor of Remington on this claim.

---

[7] Remington addresses this claim only in footnotes in its motion for summary judgment and reply. Dkt. # 16, at 26 n.2 (citing Hohenstein v. City of Glenpool, No. 11-CV-0559-CVE-FHM, 2012 WL 1886510, at *7 (N.D. Okla. May 23, 2012)); see also Dkt. # 30, at 10 n.2. Plaintiff does not discuss this claim at all.

**IT IS THEREFORE ORDERED** that Remington's motion for summary judgment (Dkt. # 16) is hereby **granted**. A separate judgment is entered herewith.

**IT IS FURTHER ORDERED** that Remington's motion in limine to exclude evidence of certain damages (Dkt. # 18) and motion in limine to exclude evidence of emotion distress (Dkt. # 19) are hereby **moot**.

**DATED** this 1st day of April, 2015.

_____
CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE